## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA,
### Southern Division

| | | |
|---|---|---|
| **SOUTHBARK INC., a non-profit,** | § | |
| **charitable corporation;** | § | |
| **Dusty Dean Feller and Emily Thompson** | § | |
| | § | **Case No.  13-183** |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Jury Demand** |
| | § | |
| **MOBILE COUNTY COMMISSION,** | § | |
| **Commissioner, Connie Hudson,** | § | |
| **Commissioner, Merceria Ludgood** | § | |
| **Administrator, John Pafenbach,** | § | |
| **Individually; and, Nancy Johnson,** | § | |
| **Individually.** | § | |
| | § | |
| **Defendants.** | | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT[1]

Pursuant to the Court's directive Plaintiff's original Complaint is being amended in its entirety with all references to preliminary relief removed; an additional party plaintiff added; and one Count removed and modifications made to others. Otherwise the body of the Amended Complaint is similar to the Original.

## I. INTRODUCTION

**1.**   The Corporate Plaintiff, an animal protection, non-profit charitable organization, challenges the decision of the Mobile County Commission, and/or any one or more of its members', decision to initially deny and to continue to deny it the privilege to participate in the County's animal adoption/rescue program which denial is premised

---

[1] Plaintiffs by titling this pleading "First Amended Complaint" is not being presumptuous.  There has been no answer; Report of the Parties; or discovery.  If Plaintiffs' Complaint survives Defendants' Motion to Dismiss, after discovery, further amendment might prove necessary.

solely upon the content of public speech by this the corporate plaintiff's officers and/or its volunteers, The offending speech was protected by the "free speech" provision of the First Amendment to the US Constitution.

2.     As a result of the defendants' act of disallowing the participation by the SouthBARK, and its policy of needlessly "killing" at risk animals housed in tis County run animal shelter, thousands of these innocent helpless animals have been subject to lethal injection of a chemical (chiefly sodium pentobarbital).  Many, if not most, of these animals would have otherwise beehem and arranging for their adoption.


## II. JURISDICTION AND VENUE

3.   This Court has federal subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim under 42 U.S.C. § 1983 arises under the laws of the United States.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over  Plaintiff's additional claims under state law because plaintiff's state law claims relate to Plaintiff's federal law claims, arise out of a common nucleus of operative  facts, and form part of the same case or controversy  under Article Ill of the United States Constitution.

5.  Venue is proper in the Southern District of Alabama, Southern Division, because Plaintiff's claims arise primarily from unlawful conduct occurring in Mobile County, Alabama.


## III. PARTIES

## PLAINTIFF:

6.   **SouthBARK, Inc.**   (SouthBARK) is a 100% volunteer, non-profit charitable 501 (c) 3 corporation, formed solely to rescue, by means of foster to adopt, and also to assist other rescuers and transporters as a partner in an effort to pull animals from shelters that regularly euthanize them because of space limitations. SouthBARK's mission is to pull animals when time is of the essence. Its concomitant goal is to save

abandoned, abused, neglected and homeless animals with the hope of not only making a difference in the animals' lives, but also in the lives of the families and individuals who adopt them. Given this credo, no officer or volunteer will receive a penny from any monetary award resulting from this litigation.  The funds generated will all be distributed back into the program to rescue and find adapting homes for as many animals as its resources will permit.

**7.  __Dusty Dean Feller__** (Dusty).  Dusty's love of and compassion for dogs and cats (affectionately referred to as "companion animals") is lifelong; coming full bore from an animal loving family background..  Because of this animal loving background, Dusty shares the view that the human race domesticated these animals, made them dependent upon us and, thus, it is our responsibility to insure that they "live long and prosper."  Currently, she has three dogs: 15 year old Labrador Retriever; a 6 year old Bull Mastiff; and a 1 year old Yorkie.

**8.**  Dusty became affiliated with Plaintiff SouthBARK during the month of June 2011. She became its Vice President shortly thereafter.  Initially, her general day to day involvement with the organization's rescue efforts included picking up dogs that SouthBARK pulled (retrieved) from the Shelter and taking them to other "no kill" shelters, foster homes, or adopters. Further, she accomplished SouthBARK's President, Emily Thompson, to meetings where, among other things, the two of them collectively offered suggestions and raised questions/concerns about the shelter to Shelter staff.

**9.**  Dusty became more active in the political side of things when the shelter blatantly starting changing policies, euthanizing dogs that had been rescue, or simply, because they had overstayed their welcome. They euthanize dogs and cats for a runny nose or a skin condition; easily treatable conditions. Shelter personnel claimed animal aggression, thereby justifying euthanization, when, in fact, the animal was just scared.

**10**.  Plaintiff Feller files this action on behalf of herself, SouthBARK, and the animals housed currently in defendants' animal shelter, and will be housed in the future in the

Mobile County Animal Shelter.  On her own behalf, she prays for solely declaratory and ultimately permanent injunctive relief. Any damages sought are being sought by and on behalf of  the nonprofit corporation.

**11. <u>Emily Thomson</u>**     At all times relevant Plaintiff Emily Thompson was the President of SouthBARK and at the time of filing the initial Complaint, was principally responsible for supervising the day to day operations of the non-profit corporation.

**12.** Thompson moved into the Mobile Alabama area in 2010.  Because of her past experience in rescuing at risk animals she sought ways to be helpful in a similar effort in Mobile. She therefore founded SouthBARK, along with a handful of other Mobile animal lovers and advocates.  Emily was  horrified to learn of the vast numbers of animals being euthanized there every day, and she  and other SouthBARK volunteers, which number more than 100,  decided something must be done about it.  MCAS didn't seem to have any consistent help from other fairly small rescue groups.  They had one employee that worked outside of her job description and took it upon herself to contact "breed specific" local rescues when a dog was brought to the shelter that she thought might fit their criteria. This was saving only a handful of dogs, leaving thousands more without a chance.

**13.**   To address this mass slaughter of animals, SouthBARK members vigorously sought out other rescue groups to rescue  animals from Mobile County's Animal Shelter (MCAS).   Most of the current "Placement Partners" currently rescuing animals from MCAS were brought to the shelter because of SouthBARK's efforts.

**14.**   Initially SouthBARK was consistently saving animals housed in the Shelter. This was accomplished by Emily and other volunteers going to the Shelter, once or twice a week, walking down the rows and rows of kennels.  They would start in the adoptions kennels and interact with each and every dog.  Emily carried a notebook with her to write down her impression of each dog – if they were shy or outgoing, if they seemed anxious or depressed or if they were just happy to have a little

4

companionship. She brought them all treats and would ask them to sit, but some were often so excited to have a "friend" they were practically doing cartwheels in their kennels.  Some would press their entire bodies up against the kennel, give you their paw and offer as many kisses as they could through the jail bars, seemingly begging Emily to save them.

**15.**    Emily's involvement with the animals in the shelter included; constantly checking on the dogs, evaluating them, talking to them, and taking pictures of them and if the ones  first took didn't seem to be getting them much attention.  She would take more.  Emily sat in their kennels with them, holding them, hugging them, petting them, and swearing to them that she would work as hard as she  could to find someone to take them to a new home.

**16.**   Because of Emily's extensive involvement with MCAS at risk animals, she was able to observe the "medical room" where the animals were often drug by catchpoles shaking and scared to their deaths.  She also observed black trash bags in which the animals were placed, thrown one on top of the other into the freezer to wait for the dump truck to take them to the landfill.  To avoid that heartbreak, Emile sacrificed her free time so she could network them all over Facebook to anyone willing to look at SouthBARK's pictures of the animals.  This was done seeking the public's help in rescuing the animals. As stated below it was Emily's and SouthBARK soliciting help via Facebook and her criticism of the Shelters operation which got her and SouthBARK banned from MCAS' animal rescue program.

## DEFENDANTS

**17.  Mobile County Commission** (the "Commission", or the "County") is the instrument of countywide government for Mobile County. Mobile County's government is peopled by three elected Commissioners, each responsible for a single district, to wit; Merceria L. Ludgood, (current Commission President), District 1; Connie Hudson, District 2; and, Jerry Carl, District 3.  By agreement and/or vote, the Commission Presidency traditionally rotates on a 16-month schedule so that each of

its three members can hold the position once during a 4-year term.  During most of SouthBARK's sanctions, Commissioner Hudson was serving as its President. The vote of any two or more Commissioners is the decision of the Commission.

**18.**  By legislative enactment, the Mobile County Commission is a body corporate, capable of suing and being sued (Ala. Code § 11-12-11).  It decides the County's legal liability for claims against the County. (Ala. Code § 11-1-2); It is also required to compromise, on such terms as it may deem just, all doubtful claims in favor of the county when such claims arise on account of monies heretofore paid in good faith by order of such County Commission or in any case where they deem it in the best interest of the County [Ala. Code 11-3-11(9)].

**19. Commissioner, Connie Hudson,** is the Commissioner for District 2 and was serving as Commission President during the periods when SouthBARK was barred from participation in the County's animal adoption program.  This Commissioner has taken the lead in the decisions to bar Plaintiff from the Shelter and, as discussed below, has been the most outspoken in defaming and placing SouthBARK in a false public light.  At all times relevant this defendant was acting under the color of law. This defendant is sued officially and in her individual capacities.

**20.  Commissioner, Merceria L. Ludgood,** is the Commissioner for District 1 and is currently Commission President.  By the use of the dog whistle (perhaps more appropriately—buzzword) "racist," Commissioner Ludgood fueled her rationale for supporting the denial of SouthBARK's program participation. At all times relevant this defendant was acting under the color of law.  This defendant is sued officially and in her individual capacities.

**21. John Pafenbach, Administrator,** was appointed by and directly responsible to the Commissioners.  Pafenbach is responsible for managing the daily operations of the County Government.  He serves as a liaison for the Commission with the public, County Department Heads and other elected officials. It was this defendant, either on his own, (he admits that he can and does make administrative decisions without

consultation with the full Commission) or with the approval of the Commission, who made and notified SouthBARK of the decision that it could no longer participate with the County's animal adoption program. At all times relevant, this defendant was acting under the color of law.    This defendant is sued solely in his individual capacity.

**22**.  **Nancy Johnson, Community Service Director**.  Ms. Johnson serves the County as its Public Affairs/Community Service Director.  This defendant has been most antagonistic to SouthBARK and its officers, and has sought their ouster from Shelter program involvement.  Ms. Johnson's stated function includes working with local, regional, state and national media, on behalf of the Commission. It is while serving in this capacity that she has slandered the SouthBARK and its volunteers.  At all times relevant, this defendant was acting under the color of law.  This defendant is being sued only in her individual capacity.


## IV. FACTUAL BACKGROUND

**23.**   SouthBARK is a network of foster homes, which means all of these former shelter dogs live in its' volunteer's homes with their families and their other pets. Volunteers including Dusty and Emily get to know the rescued animals extremely well.  Volunteers have to get the animals over any illnesses they have contracted or injuries they have sustained, get them vaccinated, spayed, neutered, and de-wormed. Emily Dusty and other volunteers drive the animals around in their cars.  Frequently, the animals sleep in the volunteer's beds, they bathe them in their tubs feed and nurture them.

**24.**   As a general rule, SouthBARK saves the dogs that no one else wanted.  Before being denied access to the stray and sick animal holding areas, SouthBARK volunteers  would routinely walk through the kennels to assess the dogs and help those that seemed most urgent (nursing mother dogs, dogs with gunshot wounds, dogs that were visibly ill, or dogs that fell into the shelter's breed ban).  They  would also

monitor the shelter's online animal database to keep track of what dogs had been there the longest, networking them as much as possible.

**25.**   There are a myriad of ways in which SouthBARK acquired dogs from the shelter when prior to being banned.  When its relationship with the shelter leadership was at its strongest, Sarah Tenon, the director at the time, would send SouthBARK a list every week, or even as often as every day, of the dogs that were slated for euthanasia. Volunteers were so effective at saving the animals on this list, that Sarah began adding all the dogs the shelter considered adoptable, so as Sarah put it, "to stay ahead of the game." SouthBARK's volunteer's photos, and in a pinch, the shelter's dismal "mugshots" were posted online.  It networked these photos to rescue groups and potential adopters all over the world. Each dog's photo was "shared," on average, 200 times.  Sometimes it takes as many as 1,000 shares before someone out there is willing to foster, adopt or rescue the animal.  Instead of holding traditional fundraisers, SouthBARKI asked for sponsors for each individual pet.  So far, the non-profit  have never had trouble raising hundreds, sometimes thousands, of dollars in a matter of days to save any particular dog in need, despite their medical condition or breed.  To date, SouthBARK has raised approximately $200,000 in this manner

**26.**   SouthBARK has publicly, and frequently, complained about Mobile County's "kill rate," and has tirelessly attempted to get the Shelter to develop a "no kill" policy similar to the "no kill" policy of the City of Mobile and 23 other "no kill" shelters in the state of "Alabama."

**27.**   Mobile County's animal shelter publically articulates a policy to aggressively seek the adoption out of healthy animals, housed in its shelter[2]. However, this claim is misleading and deceptive or else the Shelter would not have removed from its

---

[2] Specifically, the Shelter claims: "The Mobile County Animal Shelter (MCAS) consistently strives to find homes for healthy animals, but the number of abandoned animals in Mobile County continues to far exceed the number of available homes. MCAS staff diligently works to increase community awareness of the importance of spaying/neutering pets; provides alternative resources for owner surrenders; and promotes the adoption of shelter animals through social media." http://www.mobilecountyanimals.com

program SouthBARK, its most successful adoption/rescue group, solely because of unwelcome and/or   offensive comments, allegedly made by its officers and volunteers.  To save the animals, which themselves made no offensive comments, the county could have developed a thicker skin. The County's "save the animals" policy is further belied by the enormous and unconscionable "kill rate" generated monthly by the Shelter.  Over the course of the year during SouthBARK's effective absence the Shelter has euthanized over 1,000.00 animals, many of whom could have been saved by SouthBARK and its volunteers.

**28.** The County has acknowledged that during the month of May, 2012, the Shelter had a 72 percent euthanasia rate, resulting in the death of 149 dogs and 455 cats "(604 animals put to death)."   Yet, when SouthBARK was a full participatory rescue partner, working with the Shelter, and adopting animals, or arranging for their adoption, SouthBARK rescued over 1,500 animals.  Notably, the County has further admitted that SouthBARK had, during the period of its involvement, rescued more animals than all of the other private rescue organizations combined.  It is estimated that 80 percent of the animals rescued from the Shelter during SouthBARK's involvement were rescued by SouthBARK.

**29.**  SouthBARK is not just a rescue organization; it also has, as its mission, to speak out forcibly about instances of animal abuse, neglect and needless euthanization.  It was this propensity for speaking out publically, on animal abuse, and its concomitant "convenience killings", which eventually led to SouthBARK's ouster, not once, but twice.

## A. SouthBARK Speaking Out on Matters of Public Concern

### *(SouthBARK Report on Abuse and Neglect at the Shelter)*

**30.**   On January 26, 2011, SouthBARK's President, Emily Thompson  sent an exhaustive email to Donna Jones (County Director of General Services) and

Defendant Nancy Johnson (Public Affairs Director).   In this email, Emily advised Ms. Jones and Ms. Johnson that local media had approached her.  She expressed concern that the animals trapped in the Shelter were viewed more as a danger to the public and less as beloved family members (at least, potentially to some future adoptive family). Further, she complained about the high rate of euthanasia in the Shelter; and the lack of a spay and neuter program. She advised, in this email, that SouthBARK "doesn't intend to slow down (its) efforts at MCAS, or stop letting the public know when we have had an animal fall through the cracks on our watch."

**31.**   Emily also noted that visitors to the Shelter can readily notice that the facility does not always have visible food or water available to the animals.   Within two weeks of the referenced email, Emily was summoned to a meeting before Defendant, John Pafenbach, County Administrator, Glenn L. Hodge, Deputy Administrator, Donna Jones, and Defendant Nancy Johnson.  The county attorney and the Shelter director were also in attendance.  The purported purpose of this meeting was to discuss an alleged unverified claim that one of SouthBARK's volunteers, in an email, had threatened a Shelter staff member.  This single incident, involving a single unnamed volunteer, was offered as a pretext for what was to follow.  The stated reason "threaten staff" provided no information to a reasonable person.   If, hypothetically, such conclusionary language was used as the basis for a federal complaint, the complaint would not survive a dismissal for vagueness motion.  The proffered reason was, and remains, convenient-- providing no useful information[3].

### *(The Banning of SouthBARK)*

**32.**   Thus, the County employees in attendance decided that SouthBARK be given a six-month "cooling off" period.  This "cooling off period" was later explained to SouthBARK was to given the nonprofit time to think whether it wanted to continue to post adverse statements and/or continue to be critical of the Shelter.  This had the

---

[3]  Absent content, defendants' conclusion based statements may mean little to the courts and members of the learned Bar, but are highly charged and value laden to the lay community, hence fodder for defamation claims.

effect that SouthBARK could not rescue any of the animals, or visit the facility, for the next six months.        Of course, this action was intended to, and did have, the effect of chilling the rescue organization's free speech rights.   Also apparent, SouthBARK and its animal rights activist members were singled out because of their political beliefs and their effective advocacy.

**33.**    Due to the arrival of a new Shelter director, SouthBARK was permitted to resume rescuing animals.  However, a few months later, at the end of June, 2012, Dusty Feller, SouthBARK's Vice President, arranged a meeting for SouthBARK and other members of the rescue community, to discuss the Shelter with Defendant, County Commissioner Hudson.  Dusty and Emily raised several questions about the Shelter staff's ability to handle questions concerning animal availability for adoption; lack of staff training; and intervention strategies for dogs slated for euthanasia.  .

**34.**    Previously, for several consecutive months (May 2012 thru August 21, 20012) before SouthBARK's second termination event, and seven days after its' last posting (August 30, 2012), officers and/or volunteers of SouthBARK had made several postings on Facebook.  These postings were critical of the Shelter's euthanization policies, and listed, by name and picture, several dogs slated to be put to death.

**35.**   Below are samplings of comments made, on a regular and sustained basis, by volunteers of SouthBARK.   These comments were intended to urgently solicit members of the public and get them involved in SouthBARK's rescue efforts to save dogs slated to be put to death by the Shelter:

> It will be almost ONE YEAR since one of the most fabulous dogs in the world was dumped at the local kill shelter by his owner. We knew one day he would get a wonderful home, and finally that day has come! Congrats Spud and the Gill Family--~--..
> for FINALLY finding true love!
>
> Spud, dumped in the        Spud. stuck in boarding shelter on August 24, 2011

REDLISTED! URGENT! BEAUTY IN DANGER!! Needs approved foster in Mobile AL areal!' Spayed during late pregnancy swollen with milk at risk of mastitis and on death row!

PLEASE SHARE, PLEASE ADOPT, PLEASE HELP!!! We have been warned the shelter needs to "empty up" at least twelve kennels. This spells DANGER for these dogs! If you see ANY dog on MeAS' adoptables list that you would like to adopt, PLEASE DO IT IMMEDIATELY!!! Every dog adopted opens up a kennel and keeps dogs with no interest that much safer from being pts. This is the time to share--spread the word! The dogs

POSSiblY adopting, but we need help with her vet bills to make this happen. As you can see she is a star and worth every penny! Just click the link below to help Talia and her friends on death row: http://animalholicsanonymous.chipin.com/l

Here are the weekly Statistics for July 9th through July 13th. If you or someone you know is looking to adopt a new furry family member ... please let them know that we have lots available for adoption! Visit us at www. mobilecountyan imals. com

the WEEK of July 9th-July 13th!!! Please help us save these poor animals by adopting, fostering, donating and SHARING THEIR PHOTOSH

Talia loves kids! She loves life! Please don't let her and her friends die in the shelter. We need help covering their pull fees. Please share and donate to save their lives! Look at sweet Talia on her interview to be a nanny today! Talia is on death row at the Mobile County Animal Shelter – Urgent

REDLISTED! URGENT! BEAUTY IN DANGER!! Needs approved foster in Mobile AL areal!' Spayed during

late pregnancy swollen with milk at risk of mastitis and on death row!

MONIQUE #A045239
Please share MONIQUE! She doesnlt have much time because the shelter is FULL! She is listed as a 1 year old Collie mix that weighs 30 pounds. If you are interested in adopting MONIQUE please call 251-574-3647, or visit the shelter at 7665 Howells Ferry Rd. and take her home with you! If you are not local and need rescue assistance please email adopt@saveasout

There are still TWO DOZEN dogs that have no plan, no interest and no sponsors. Please help us get them out alive by sharing their pictures, fostering, adopting or sponsoring. Thank you!

Chipln: LAST CALL DOGS
No 'mtI9E is ClWrel
av~IIhble':ort IS 01 animalholicsanonymous.chipin.com

***RESCUED BY SOUTHBARK FOR ADOPTER*** COCO NEEDS A PLAN BY THE TIME THE SHELTER OPENS ON MONDAY MORNING 7-23!!! PLEASE SHARE!!!

Coco #A045487 is a beautiful 11 month old Pit Bull who is set to die at the Mobile County Animal Shelter in Mobile, AL. Coco is on this list simply because of her breed! She needs your help to save her. Coco is a sweet little girl who doesnlt want to die
because of a sterotype! If you are interested in saving Coco, please email adopt@saveasoutherndog.com! The shelter does not adopt IIbull¥ breeds, to the public so

PLEASE SHARE, PLEASE ADOPT, PLEASE HELP!!! We have been warned the shelter needs to "empty up" at least twelve kennels. This spells DANGER for these dogs! If you see ANY dog on MCAS' adoptables list that you would like to adopt, PLEASE DO IT IMMEDIATELY!!! Every dog adopted opens

up a kennel and keeps dogs with no interest that much safer from being pts. This is the time to share--spread the word! The dogs
We have until tomorrow to save them!

Mobile      County      Animal      Shelter      -      Urgent~
Dogs

Mobile County Animal Shelter euthanized 7 healthy dogs Friday, August 17 because they are out of room. They are NOT kidding around they will continue to kill these dogs until their numbers decrease. Demi, Candy, Dill, Dynamite, Rufus, Rocke and Sampson lost their lives for no other reason than the shelter needed the space. ADOPT, DONATE, SHARE, HELP! TODAY!

URGENT   DIES   4PM   MONDAY   2-27*~   Have you seen anything more lovely than this little girl named Ginseng (A042525)? She is even sweeter than she is pretty. Please someone

save her. Little pity imposter ... she doesn't want to die. :(due to die *Monday Feb !l7 4:00 Female bulldog*

*Mobile, At*

*Too pretty to die Rtscue only dut lo breed restrictions*
*adopt@sa.veasoutherndog.com*

We had a hectic day yesterday with a last  minute rescue run to the shelter! Please  consider chipping in to care for all of these  pups that were doomed to die, but  saved because of people like you! They all need fosters/adopters/rescue and sponsors

**36.** SouthBARK, by and through its volunteers, solicits donations and share information, via Facebook.   Facebook is a social networking service launched in February 2004, owned and operated by Facebook, Inc.  As of September 2012, Facebook had over one billion active users. *The Wall Street Journal* (Dow Jones),

14

October 4, 2012.  Users must register before using the site, after which they may create a personal profile, add other users as friends, and exchange messages. Additionally, users may join common-interest user groups, organized by workplace, school or college, or other characteristics, and categorize their friends into lists.

**37.** The test for characterizing a media source as a "public forum" is its' use for the purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939). Thus, Facebook is an electronically sourced public forum.

**38.** SouthBARK has a public Facebook page with approximately 7,000 subscribers. Angela Gray, an employee of the Shelter, on a regular, if not daily, basis, monitored SouthBARK's Facebook posting and reported her findings to her superiors, and others, including SouthBARK's officers.

**39.** On August 27, 2012, Emily received an email from Shelter Supervisor, Sarah Tenon, complaining about a supposed Facebook entry stating that dogs were going to die due to the Hurricane. Emily explained that neither she nor members of her staff had anything to do with the "Facebook" entry.

**40**. The comments attributed to SouthBARK's volunteers were, for the most part, "fair comment" about a matter of public concern (needless destruction of companion animals) and was protected by the free speech provision of the first amendment to the United States Constitution.

### B. SouthBARK's Termination and Defendants' Subsequent Defamation Campaign against SouthBARK

**41.** Three days later (August 30, 2012) SouthBARK received a letter from Defendant Pafenbach advising that the animal rescue group would no longer be able to participate in acquiring animals from the Shelter. The letter advised that due to repeated (unidentified) incidents of disruptive Shelter operations "SouthBARK and/or

its officers and members, will no longer be able to acquire dogs."   No further specification was provided.

**42**.   On September 6, 2012, Emily returned a call from Nancy Johnson who reaffirmed that SouthBARK would no longer be able to obtain dogs.   When questioned why, Nancy's response was "the same reasons as last year".

**43.**  This is consistent with statements that Defendant Pafenbach made publically at a County Commission meeting on September 13, 2012:

> **Pafenbach:**  In February 2011, the situation with SB (SouthBARK) had deteriorated so much that we met with Miss Thompson and her attorney to discuss the problems and we were not even able to agree that there were problems, much less try to promote any type of resolution to them.  So at that time, I asked them to stay away for 6 months to give us a cooling down period in hopes that they would come to understand that the county is required by law to operate a shelter, that certain standards are required of the county, and there is a responsibility to the community and we hoped they would come back with sincere efforts to work with us, not against us.  At the end of the 6 months, they came back with a sense they would abide by our rules.  Almost immediately we began experiencing the same types of problems that had led to the 6 month cooling off period.  This went one and on and finally earlier this year it got to the point that it was an everyday thing they were experiencing. So went to the commission recently and advised them my recommendation was to ban SB from the shelter.  This was based not only on the problems they were causing our employees, it had gotten so bad that our employees were working in an environment of intimidation, harassment, they were being bullied by SB members, but we also had other rescue groups questioning whether or not they could work with us.  Not just rescue groups, we had veterinarians, professional medical people who volunteered their time to help us at the shelter questioning whether or not they could continue under these conditions.  So I went back to the commission as I said and the commission supported that decision.

Later, at that same public hearing, referring either to SouthBARK's officers or volunteers, he added this comment: "they are repugnant."

**44.**   Defendant Pafenbach, as well as other officials associated with the Shelter, are well familiar with Emily and Dusty.  If these two were the ones threatening, in some unspecified manner, he could have stated such. SouthBARK is supported by over 100 loosely affiliated volunteers. Neither of these officers can control their volunteers' free speech, nor would they desire to do so.  Are SouthBARK's volunteers zealous? Absolutely. But that is exactly what we want in a free, vibrant society. Our public officials are elected or selected-- not anointed.

**45.**   At the September 13 public meeting, Defendant Hudson spoke in the same vein as did Defendant Pafenbach:

> **Connie Hudson**:  And we have seen these, we have all seen these, and it just, you know there is a lot of good this group does and I commend the adoptions, if only we could take the good and leave out the bad, I would be all for this, but we cannot knowingly allow people that go to work every day to be bullied.  Right now in America there is a push all across this country to stop bullying in classrooms. Well the work place is no different.  People do not deserve to be bullied and harassed while they're trying to do their job, and they're trying to do a good job.  And you may not realize, I think there are a lot of people involved in this organization that don't realize some of the context of the information that is going out there or being said about people.  You know if you, it just, it crosses the line, ladies and gentleman, and I would, I'm not gonna sit here and say that we can't do something down the road,

**46.**   On September 17, 2012, a few weeks after terminating SouthBARK's program participation, county employees acknowledged to the Mobile Press Register, an awareness of SouthBARK's Facebook posting, as is evident from the following defamatory excerpts from the publication:

> The Mobile County Commission is sticking by its ban of SouthBARK, a prolific but controversial rescue group, saying the group's behavior is too extreme to justify allowing it to continue working with the county.

The county released a series of online chat transcripts that appeared to have been pulled from SouthBARK's private Facebook page. Nancy Johnson, a spokeswoman for the county, said the messages were forwarded from a member of the Facebook group.
The chats show members calling shelter employees names, questioning their devotion to the animals and, in one case, accusing a high-ranking shelter official of getting her job by sleeping with a county official.

One employee was called "a waste of human flesh" that someone should "neuter.. tie him to a tree with a collar on his neck staked with a heavy chain and no food, water and definitely no shelter from the elements." Johnson said the messages, though gleaned from an ostensibly private chat room, show that SouthBARK has been acting in bad faith with no sincere intention to work with county officials

**47.**   Defendant Nancy Johnson, Public Affairs Director for the County,  in an article dated September 8, 2012, published in the Mobile Press Register,  affirmed that the same  public disclosure of unwelcome facts which resulted in the earlier suspension, mothered the August 30, 2012   termination: "We made the decision to end the association because SouthBARK continually disrupted the operations of the Mobile County Animal Shelter to the point where their association is doing more harm than good in our efforts to shelter these unwanted animals by its failure to abide by the rules and protocols which all other partners honored,"  Defendant Hudson is reported in the same interview as stating" that the group (SouthBARK)  was "putting out false information" about the Animal Shelter".

**48.**   In an article written by Robert McClendon, Mobile Press-Register, dated September 14, 2012, he reports that: "County Commission President Connie Hudson stated that it was a shame that the county couldn't get "the good without the bad," because SouthBARK was providing an important service. However, she said, "We cannot knowingly send people to work every day to be bullied."  Hence, she repeated, in the press conference, what she had said at the Commission's public meeting on September 13, 2012.

**49.**  On or about January 28, 2013, the Shelter euthanized 49 dogs. This action was taken allegedly because a single dog was displaying signs of distemper. Therefore, all of the dogs housed together with the infected dog, and allowed to play outside together, were deemed at risk for getting the disease. All of the dogs were put to death.

**50.**  Approximately one week later, on February 7, 2013, while SouthBARK was still barred from program participation, it's President, Mrs. Thompson was called by the Shelter's office manager, Kathy Belcher, and advised that 16 dogs and puppies were to be euthanized within the hour.  Ostensibly, someone in County Administration advised management that they needed to call SouthBARK before euthanizing another large batch of animals and avoid public outrage.

**51.** SouthBARK's Vice President went immediately to the shelter and gathered all of the dogs and took them to a safe location. A few days later, Dusty and Johnny Hatcher met with Defendant Hudson, and Defendant Pafenbach.  Dusty thanked Pafenbach for allowing his staff to call SouthBARK to save the dogs.  Pafenbach's  response to Dusty, in front of Commissioner Hudson and Johnny, was:  "Please don't thank me. That will never happen again.  That was a huge mistake and I am so sorry to have gone against the Commission by calling SouthBARK." True to his word, SouthBARK was not to be called again.  Commissioner Hudson did not correct him.

### C.  *The "cry of racism" and its use  to justify continued  exclusion*
### *Ludgood's Free Speech—Retaliation*

**52.**  One final act of retaliation, by a Commissioner, occurred on February 20, 2013, less than three weeks after SouthBARK had bailed the Shelter out of a potentially embarrassing, and for the dogs involved, lethal, situation.  On this day, SouthBARK's Vice President and her friend Hatcher visited Commissioner Ludgood, in yet a further attempt to have SouthBARK reinstated to the program. Commissioner Ludgood advised them that the organization would not receive her support for reinstatement because she had received word that Emily was a "racist."  This comment, with its

oppressive and repulsive overtones, was unsupported with particulars, and was, at best, premised upon hearsay.  Yet, this vicious rumor formed the stated basis for this defendant's continuing denial of SouthBARK's program participation.

**53.**  Emily had previously appeared at a Commissioner's meeting where she provided testimony adverse to the conditions of the Shelter and its deplorable "kill rate".  These are the only comments to which Commissioner Ludgood would have been privy, or from which she had learned from others, the contents of Emily's statements.

**54.**  Commissioner Ludgood has used her articulated belief that Emily is a "racist" to deny SouthBARK the right to participate in the County's animal rescue program.  By doing so, she has also condemned numerous animals to a certain death.  Assuming that the charge (racist)  was true, and assuming further that it was capable of some general definition (other than I know it when I see it), what does Emily's purported "racism" have to do with the rescue of innocent animals?  Example, would a reasonable person stranded at sea refuse to accept assistance from a rescuer believed to be a racist?  Does this Commissioner factor in a person's alleged "racism" as a proxy for all administrative decisions to which she is called upon to make?

**55.**  Preceding Feller's meeting with Ludgood was a meeting on February 14, 2013 was a meeting with Commissioner Hudson and County Administrator, John Paffenbach.  During this meeting, Feller, on behalf of SouthBARK,fell on her sword and promised that the non-profit, in the future, would  self censer itself and its volunteers by monitoring future Facebook listing to insure that no future offensive publications occur.  These defendants would not be moved by this act of attrition and steadfastly refused to permit SouthBARK to rescue animals from its shelter.  At no time during these discussions did either of these defendants deny that the Facebook postings were the reason in fact for the ban.

**56.   The Defendants have relented slightly by permitting certain volunteers, except Emily, to pull animals from its shelter, but only if they are doing so on behalf of another rescue partner—even if this partner**

subsequently transfer the animals to SouthBARK.   There are several problems with this arrangement (a) the Defendants can change their minds and prevent either or both the volunteers and/or surrogate rescue origination from rescuing animals; (b) the surrogate organizations, fearing retaliation, may refuse to permit SouthBARK volunteers to pull animals under their banner; and (c) SouthBARK's funding has been and will continue to be hampered if it can't publicize that it is seeking funding to rescue animals from MCAS. It matters not that it may be deemed that the advertising may be technically correct.   If a potential donator contacts MCAS and ask if SouthBARK is pulling animals from its,' Shelter the response will be, and have been an unqualified "no".

.

### D.  Standard of Judicial Review

### 1. The Free Expression Clause

#### (a).  *Public Speech Must Be Afforded the Widest Swath*

**57.**   In a lofty principle articulated by a lofty Court it was observed: "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964).  Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145  (1983).

**58.**   Matters concerning public speech must be given wide sway: "(P)rinciples that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors" *Snyder v. Phelps***,** 131 S. Ct. 1207, 1216 (2011). Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community,"  Id.

**59**.  "As in other First Amendment cases, the court is obligated "to `make an independent examination of the whole record' in order to make sure that `the judgment does not constitute a forbidden intrusion on the field of free expression."Id.  Deciding whether speech is of public or private concern requires the Court to examine the "`content, form, and context'" of that speech, "`as revealed by the whole record.'" '" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 7613 (1985) (quoting *Connick, supra,* at 147-148,).

**60**.  By asserting that its privilege to adopt animals from the Mobile County's animal shelter was terminated because its volunteers engaged in speech, important to the public, but offensive to the defendants, SouthBARK has asserted a claim, which if proven, would entitle SouthBARK to relief. See , *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."). A cause of action may arise from the curtailment or elimination of a governmental benefit in retaliation for a plaintiff's exercise of First Amendment rights.  *Georgia Association of Educators v. Gwinnett County School District,* 856 F.2d 142, 144-45 (11th Cir. 1986). In *Perry v. Sindermann,* supra at 593, the Supreme Court also stated that even though a person has no "right" to a valuable government benefit (e.g., acquiring animals from a government run  animal shelter)  and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in free speech". Id. at 597.(Emphasis added).

### 2. Prima Facie Case

**61**.  The Eleventh Circuit defined the elements of a *prima facie* first amendment retaliation claim in *Castle v. Appalachian Technical College*, 631 F.3d 1194 (11thCir.2011), holding that a plaintiff must show that: **"(1)** (its) speech was

constitutionally protected; **(2)** (it) suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and **(3)** there was a causal relationship between the adverse conduct and the protected speech." Id. at 1197 (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011) (quoting *Castle*, 631 F.3d at 1197).

### 3. *Governmental Official's argument that the speech was offensive or defaming must be viewed with suspicion*.

**62.** Defendants have publically asserted that it was the **"contents"** of the speech from SouthBARK's supporters, which they found "offensive", justifying their act of terminating SouthBARK from further program participation. Indeed, "the point of all speech protection... is to shield just those choices of **content** that in someone's eyes are misguided, or even hurtful."*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 574, (1995), (emphasis added); "(I)n public debate [we] *must tolerate insulting, and even outrageous, speech in order to provide adequate `breathing space' to the freedoms protected by the First Amendment*." *Boos v. Barry,* 485 U.S. 312, 322, (1988) (emphasis added).  As the Supreme Court observed, the Constitution "demands that content-based restrictions on speech be presumed invalid . . . and. . .  the Government bear the burden of showing their constitutionality." *Ashcroft v. American Civil Liberties Union,* 542 U. S. 656, 660 (2004).

**63.** The Court in *New York Times Co. v. Sullivan*, supra, ruled  that actual malice must be established  before speech concerning  public officials or public figures  be suppressed or punished under the rubric of  defamation and libel.  This principle was

affirmed in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (thus holding that strict liability for defamation of public officials is unconstitutional in the United States).

### E. SouthBARK's Damages

**64.**    As stated in paragraph 6 above, SouthBARK is a not for profit 501(c) 3 corporation. Its officers receive no salary or other income. It has no paid employees on staff. Its' volunteers do not get reimbursed for expenditures incurred in pursuit of the corporation's mission.  This doesn't mean that SouthBARK does not generate income. It has two means of generating income, both frustrated by the acts of the defendants.

**65.** After SouthBARK obtains animals from the Shelter, and makes the necessary medical checks and grooming, it permits the pet to be adopted out.  It charges the new family $95.00, as an adoption fee.   SouthBARK has been denied, thus far, approximately 900 animals at $95.00 a pet ($85,000.00 sub-total). The next method of revenue is generated from donations.   Obtained pets are listed on Facebook and/or some other social media outlet and donations are requested for animal's care and adoption preparations.  The donations received are then plowed back into obtaining more animals. Collectively, SouthBARK has lost over $350,000.00 resulting from being blacklisted from participation in the County's adoption/rescue program.

.   **V. CLAIMS FOR RELIEF**

**<u>FEDERAL CLAIMS</u>**

**<u>COUNT ONE</u>:  MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983**
**(Basis for the below claims against Mobile County Commission)**

**66.**    Under Ala. Const. of 1901, § 14, the State of Alabama has absolute immunity from lawsuits. This absolute immunity extends to arms or agencies of the state, see, e.g., *Armory Comm'n of Alabama v. Staudt,* 388 So.2d 991, 993 (Ala.

1980), but generally does not extend to counties or county agencies, see, e.g., *Wassman v. Mobile County Communications Dist.,* 665 So.2d 941, 943 (Ala. 1995), or to municipalities or municipal agencies, see *Jackson v. City of Florence,* 294 Ala. 592, 600, 320 So.2d 68, **6** (1975).

**67.** Mobile County is not a department of state government and is not entitled to Eleventh Amendment sovereign immunity. The Alabama Constitution, at Art. V, § 1, as amended, lists only the "governor, lieutenant governor, secretary of state, auditor, treasurer, and attorney general" sheriffs and the superintendent of education as constituting "the executive department."

**68.** However, a county is a "person" within the meaning of 42 U.S.C. § 1983 (1994), and is, therefore, liable for constitutional violations caused by policies or customs adopted by its lawmakers or by "those whose edicts or acts may fairly be said to represent official policy." *Monell v. Department of Social Servs. of New York,* 436 U.S. 658, 659 (1978).

**69.** A county may be held liable for a single act or decision of an official with final policymaking authority with respect to the matter in question. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). State law, custom and usage must be examined to determine whether a particular official has final policymaking authority. *Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

**70.** There can be no serious dispute that the Mobile County Commission is the final policymaking authority with respect to the matter in question—the operation and policies of the Mobile County Animal Shelter. Defendant Pafenbach admitted as much when he stated: "Please don't thank me. That will never happen again. That was a huge mistake and I am so sorry to have gone against the Commission by calling SouthBARK." Hence, even without establishing a policy (the commands of at least

two of the Commissioners certainly are) the County cannot assert immunity from its own decisions.

**71.**     An alternative basis for piercing the immunity of municipal government is implicated when a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of 1983.   "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

**72.**     The policy of the County Commissioners (or at least a majority of them) was not only to encourage the suppression of free speech among its subordinates, but to actively participate in such suppression themselves. This is evident, not only in Commissioner Ludgood's denial of program participation by SouthBARK on account of its President's protected speech, but also in Commissioner Hudson's comments suggesting that not being able to separate the good (SouthBARK's massively successful rescue efforts) from the bad (its volunteers penchant for speaking badly about the Shelter and or its employees) the Commission decided to terminate SouthBARK's animal rescue participation.

## <u>COUNT TWO</u>: FREE SPEECH-GENERALLY

**73.**     The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech . . ." Id. The free speech clause was incorporated nearly ninety years ago through the Fourteenth Amendment's Due Process provision, as among the fundamental liberties meant to apply to state and local government entities and their officials. See *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (holding that speech and press freedoms are protected by Fourteenth Amendment).

**74.**   As stated in paragraph 35, above, the comments made by officials and volunteers of SouthBARK were precisely the species  of speech protected under first amendment "free speech" provision.  It cannot seriously be disputed, by unbiased observers, that there are a vast number of dog and cat lovers in this country, and beyond.  Many pet lovers would take alarm at the alarming numbers of dogs and cats put to death, on a monthly basis, by the County.. The comments made by SouthBARK's volunteers were a plea for help from this animal loving community, seeking both donations and adoption, and further was intended to raise the alarm with an appeal to assist it in the alleviation of the dire straits of these animals..  Even had SouthBARK's volunteers speech been made to a selective group of Facebook readership, this fact would not compromise its protection.  "The private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern." See for instance Rankin *v. McPherson,* 483 U.S. 378, 387 n. 11 (1987).

**75.**   The fact that SouthBARK volunteers' statements[4] about the Shelter may have been inappropriate, or controversial, is irrelevant to the question of whether they dealt with a matter of public concern. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964); see also *Bond* v. *Floyd,* 385 U. S. 116, 136 (1966): "Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected."  SouthBARK, and its volunteers, are included within the sweep of these guiding principles.

---

[4] As an aside, a corporation acts by and through its officers and employees.  So to, does SouthBARK act by and through its officers and volunteers.  The defendants cannot have it both ways.  If SouthBARK is punished due to the acts of its officers and/or volunteers, then it can employ the same rights to free speech as would be available to its officers and volunteers, especially in defense of its wrongful ouster.

## COUNT THREE:  FREE SPEECH--RETALIATION

**Claim is brought against the County Commissioners, and Administrator Pafenbach, individually on behalf of SouthBARK and Emily Thompson**

**76.**    The Eleventh Circuit defined the elements of a *prima facie* first amendment retaliation claim in *Castle v. Appalachian Technical College*, 631 F.3d 1194 (11thCir. 2011), holding that a plaintiff must show that: "(1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and, (3) there was a causal relationship between the adverse conduct and the protected speech." Id. at 1197 (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011) (quoting *Castle*, 631 F.3d at 1197).

**77.**    On January 26, 2011, SouthBARK's President, met with various county officials associate with the County's animal shelter.  At this meeting, Emily advised that the local media had approached her.  She expressed concern that the animals trapped in the Shelter were viewed more as a danger to the public and less as beloved family members. Further, she complained about the high rate of euthanasia in the Shelter; the lack of a spay and neuter program She followed up this meeting with an email in which, among other things, she advised that SouthBARK "doesn't intend to slow down our efforts at MCAS, or stop letting the public know when we have had an animal fall through the cracks on our watch."

**78.**    Within two weeks of the referenced email, SouthBARK's President was summoned to a meeting before Defendant, John Pafenbach, County Administrator; Glenn L. Hodge, Deputy Administrator; Donna Jones; Nancy Johnson; the county attorney.  The Shelter Director was also present at this meeting.  The purported

purpose of the meeting was to discuss an alleged unverified claim that one of SouthBARK's volunteers, in an email, had threatened a Shelter staff member.  This single incident, involving a single unnamed volunteer, was offered as a pretext for what was to follow.

**79.**    At the conclusion of this meeting, Defendant Pafenbach, either taking it upon himself, of with the prior approval of the Commission, advised Emily that SouthBARK will be suspended for a 6 month period to provide a "cooling off period." The cooling off was to be a check on SouthBARK's volunteers, and provide them with a period where they can self sensor their unwelcome speech.

**80.**    SouthBARK's President's speech was **(1)**   constitutionally protected; **(2)** SouthBARK suffered an adverse affect (loss of rescue privileges)  which ,if known, would likely deter a person of ordinary firmness from engaging in such speech; and **(3**) there was a causal relationship between the adverse conduct and the protected speech." One followed the other within weeks. There was a subsequent statement by County officials that unwelcome speech had led to this suspension.

**81.**    The action of suspension was to retaliate against SouthBARK's for its volunteer's/officer's speaking out on matters of public interest. This action violated SouthBARK's first amendment free speech rights , made applicable  to the states via the fourteenth amendment, and is actionable as a legal claim by operation of 42 U.S.C.§ 1983.

## <u>COUNT FOUR</u>:  FREE SPEECH--RETALIATION

### Claim is brought against the County Commissioners; Commissioner Hudson, individually; and, Administrator Pafenbach, individually on behalf of SouthBARK and Emily Thompson

**82.**    On or about June 30, 2012, SouthBARK's Vice President arranged a meeting with Commissioner Hudson, then Commission President.  Other members of the animal rescue community attended this meeting.  SouthBARK's President and Vice President both raised questions about the Shelter's staff ability to handle questions

concerning animal availability for adoption; lack of staff training; and intervention strategies for dogs slated for euthanasia.

**83.** During this period, and for several months thereafter, SouthBARK employed the services of Facebook to undertake a sustained public campaign designed to give public awareness to the vast numbers of animals being euthanized at Mobile County Animal Shelter.  SouthBARK's postings requested the public's intervention to help rescue the animals, mostly canines. SouthBARK's Facebook postings were supplemented with pictures of the dogs slated for death. SouthBARK's volunteers did not possess the power to implement County policy.  Most probably they lacked the gravitas to influence policy. However, most certainly they had the right to speak loudly, and publically, about it.

**84.** On August 27, 2012, Emily received an email from Shelter supervisor, Sarah Tenon, complaining about a supposed Facebook entry stating that dogs were going to die due to the Hurricane.  Within 3 days of this email, SouthBARK received a letter from Defendant Pafenbach advising that the animal rescue group would no longer be able to participate in acquiring animals from the Shelter. The letter referenced repeated (unidentified) incidents of disruptive Shelter operations. A few days later SouthBARK's President returned a call from Nancy Johnson, who reaffirmed that SouthBARK would no longer be able to obtain dogs.  When questioned why, Nancy's response was "the same reasons as last year".

**85.** SouthBARK's volunteers' speech was **(1)** was constitutionally protected; **(2)** SouthBARK suffered adverse conduct (permanent termination from animal rescue privileges)  that which ,if known, would likely deter a person of ordinary firmness from engaging in such speech; and **(3)** there was a causal relationship between the adverse conduct and the protected speech." One followed the other within days.

**86.** The action of termination was to retaliate against SouthBARK's for its volunteer's/officer's speaking out on matters of public interest. This action violated SouthBARK's first amendment free speech rights , made applicable  to the states via

the fourteenth amendment, and is actionable as a legal claim by operation of 42 U.S.C.§ 1983.

## <u>COUNT FIVE</u>: FREE SPEECH--RETAILATION
(Claim Solely Against Commissioner Ludgood)

**87.**   Commissioner Ludgood, by her own admission, stated that she was opposed to SouthBARK's reinstatement in the Shelter's animal rescue program due to the alleged statements of its President.  Statements she termed as "racist."   The only statement to which this defendant could possibly have made reference were comments made by SouthBARK's  President during a public forum held by Defendant  Commission, where she spoke out about  conditions of the Shelter, and its euthanization policies, which comments clearly come within the realm of free speech on matters of public concern.   As stated in Section D (1) (a) above, speaking out on matters of public concern is protected under the First Amendment Free Expression Clause. This was known, or reasonably should have been known on February 20, 2013 when this defendant made or articulated to a SouthBARK representative her decision.

**88.**  As before stated, to evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the defendant's misconduct. This two-pronged analysis may be done in whatever order is deemed most appropriate for the case. *Pearson v. Callahan*, 555 U.S. 223, at  236 (2009).

**89.**  Defendant Ludgood, though a County Commissioner, was sued only in her individual capacity.   No proffered claims of qualified immunity will shield government officials (such as this defendant) who perform discretionary governmental functions from civil liability if their conduct violates any "clearly established statutory or constitutional rights, of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). However, here, Defendant Ludgood, a prominent lawyer, even if **not currently**

practicing, should not be judged by the typical "reasonable person" standard.  Yet, even if she is so judged by the reasonable person standard, the unconstitutionality of her decision to exclude SouthBARK from Shelter program activity, due to the contents of speech, was widely known.

**90.**   The action of this Commissioner to forever bar SouthBARK from County program participation due to its President's protected speech was to retaliate against SouthBARK's for its officer's speaking out about matters of public concern. This action violated SouthBARK's first amendment free speech rights, made applicable  to the states via the fourteenth amendment, and is actionable as a legal claim by operation of 42 U.S.C.§ 1983.

## COUNT   SIX: 1983 DEFAMATION—STIGMA-PLUS STANDARD

**91.**    Defamation claims under 42 U.S.C. § 1983 poses a retching difficulty. Defamation is generally a matter of state law, while 1983 claims are premised upon constitutional and federal law violation claims.  Hence, not all defamation offenses perpetrated by state officials provide a right of action under 42 U.S.C. §1983.

**92.**   Yet, a  1983 action is  sufficient for defamation purposes when (**1**) the plaintiff suffered injury to (its)  reputation from an official's false statements, and (**2**) the plaintiff has also suffered  burden or alteration of status or rights.  This doctrine is known as the "stigma-plus" test.  See, *Paul v. Davis*, 424 U.S. 693, 701-02 (1976); *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001), *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1438 (11th Cir. 1998). The test requires the plaintiff to show both a  valid defamation claim (the stigma) and "the violation of some more tangible interest" (the plus). *Behrens v. Regier*, 422 F.3d 422, 1260 (11th Cir. 2005). Damages to a plaintiff's reputation "are only recoverable in a section 1983 action if those damages were incurred as a result of government action significantly altering the plaintiff's constitutionally recognized legal rights." Cypress, 144 F.3d at 1438.

93.   The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "To establish a liberty interest sufficient to implicate the fourteenth amendment safeguards, the individual must be not only stigmatized but also stigmatized in connection with . . . [a] government official's conduct [that] deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation."

94.   Here, this standard is met.  Prior to the stigmatization, SouthBARK was, as were other animal rescue organizations, permitted to purchase and/or adopt dogs housed in defendants' shelter.  SouthBARK was deprived of both the liberty interest in protecting at-risk animals, and a property interest in the animals themselves.  This interest, with the stigma caused by defendants' several referenced press releases, was and remains sufficient to trigger the "stigma-plus" standard and entitle SouthBARK to advance a defamation claim against these defendants under 1983.


### COUNT SEVEN:  1983 DEFAMATION

### Count is brought against Commissioner Hudson, Administrator Pafenbach and Nancy Johnson, all in their individual capacities

95.   Under Alabama law, defamation consist of the following elements: '(1) a showing that the defendants were at least negligent with respect to their loose comments about the Plaintiff; *Mead Corp. v. Hicks*, 448 So.2d 308 (Ala.1983); (2) that there was a publishing of (3) a false and defamatory statement to another; (4) concerning the plaintiff; (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod):  *Albert Miller & Co. v. Corte*, 107 F.2d 432 (5th Cir.1939)."

96.   In the referenced February 2011 meeting, Defendant Pafenbach publically claimed that one or more of SouthBARK's volunteers, in an email, had threatened a

Shelter staff member.   In a letter dated August 30, 2012, Defendant Pafenbach publically accused SouthBARK, by and though its volunteers, of repeated incidents of disruptive Shelter operations.  On September 6, 2012 Defendant Nancy Johnson publically affirmed that SouthBARK would no longer be able to obtain dogs.   When questioned why, Nancy's response was "the same reasons as last year. On September 13, 2012, at a publicly attended meeting Defendant Pafenbach stated "we hoped they (SouthBark) would come back with sincere efforts to work with us, not against us.  At the end of the 6 months, they came back with a sense they would abide by our rules. Almost immediately, we began experiencing the same types of problems that had led to the 6 month cooling off period.  . . . This was based not only on the problems they were causing our employees, it had gotten so bad that our employees were working in an environment of intimidation, harassment, they were being bullied by SB (SouthBARK) members, but we also had other rescue groups questioning whether or not they could work with us.   Not just rescue groups, we had veterinarians, professional medical people who volunteered their time to help us at the shelter questioning whether or not they could continue under these conditions.  So I went back to the commission as I said and the commission supported that decision". Pafenbach would also state, in that same public meeting, "they are repugnant", in reference to SouthBARK's volunteers. At this same public forum, Defendant Hudson stated:

> . . . but we cannot knowingly allow people that go to work every day to be bullied.  People do not deserve to be bullied and harassed while they're trying to do their job, and they're trying to do a good job. And you may not realize, I think there are a lot of people involved in this organization that don't realize some of the context of the information that is going out there or being said about people.  You know if you, it just, it crosses the line, ladies and gentleman, and I would, I'm not gonna sit here and say that we can't do something down the road,

**97.**   The above assertions by Defendant Hudson were repeated by her in a public (September 14, 2012) Mobile Press Register article, written by Robert McClendon,  in which it is reported that "County Commission President Connie Hudson said "it was a shame that the county couldn't get "the good without the bad," because SouthBARK was providing an important service. However, she said, "We cannot knowingly send people to work every day to be bullied."  In an article posted September 17, 2012, again in the Mobile Press Register, Defendant Nancy Johnson is reported to have stated "group's behavior is too extreme to justify allowing it to continue working with the county", and "SouthBARK has been acting in bad faith with no sincere intention to work with county officials" both comments in reference to SouthBARK and its volunteers. In an earlier article, also published in the Press Register,  September 8, 2012,  this defendant is reported to have stated "We made the decision to end the association because SouthBARK continually disrupted the operations of the Mobile County Animal Shelter to the point where their association is doing more harm than good in our efforts to shelter these unwanted animals by its (SouthBARK's) failure to abide by the rules and protocols which all other partners honored,"  See generally paragraphs  31, 39-41, and 43-46, above.

**98.**   These comments and other similar comments, were untrue when made.  These defendants knew they were untrue when made or they were negligently made, with little regard for their truthfulness. The false accusations generated several public comments, many of which were hostile, caustic, and stigmatizing; rebuking both SouthBARK and its volunteers, thereby placing the organization in ill repute with the public. SouthBARK, having lost a tangible property interest and having suffered public stigma due to the published comments of these defendants, have stated a cause under the fourteenth amendment due process clause of the Constitution; the violation of which  42  U.S.C. § 1983 provides a remedy.

## <u>COUNT  EIGHT</u>:  DECLARATORY WITH  RESPECT TO SOUTHBARK'S INDIVIDUAL CLAIM
### Claim attaches to all defendants

**99.**     SouthBARK, Dusty and Emily seek, and are entitled to, a declaration that SouthBARK   was denied participation in the County's animal rescue program in retaliation for speech by its volunteers which was protected by the first amendment, but which the defendants found offensive or otherwise unsatisfactory. To ameliorate the harsh effects of this decision, and to prevent similar decisions in  the future, SouthBARK and Dusty   seek, after trial   a permanent injunction, restraining, defendants from denying to it the    privilege, as is enjoyed by other rescue organizations, to rescue animals, to the extent of its ability and the availability of animals detained in defendants' animal shelter.

## <u>STATE LAW CLAIMS</u>

## <u>COUNT NINE:</u>
## MUNICIPAL LIABILITY FOR CERTAIN STATE LAW CLAIMS
### (Principles applied against all defendants)

**100.**    Alabama state actor immunity law first asks if defendants were engaged in a discretionary function at the time of injury to the Corporate Plaintiff. If they were, then the County is similarly shielded from liability.  However, if a state agent acts "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law," there is no immunity. *Ex parte Cranman,* 792 So. 2d 392, 405 (Ala. 2000). For purposes of the immunity issue, "willful," "malicious" and "bad faith" all require evidence that the defendant acted with the intent to injure, or with ill will towards the plaintiff. *Ex parte Nail,* 879 So. 2d 541, 546 (Ala. 2003).  Characterizing the named defendants' defamatory acts complained of herein as "willful, malicious and done in "bad faith," this alone would bar defendants from the protection of state agent immunity.

**101**.  As stated above, the defendants were not engaged in a discretionary function when they defamed SouthBARK.  Therefore, they do not come under the auspices of state agent immunity.  Generally speaking, to be considered engaged in "discretionary functions" a state actor should be involved in "planning tasks" and "policy-level decision-making" in order to qualify for immunity. See *Defoor v. Evesqu*e, 694 So. 2d 1302, 1305 (Ala. 1997), followed in *Town of Loxley v. Coleman*, 720 So. 2d 907 (Ala. 1998).

**102.**  Finally, if defendants' defamation and their removal of SouthBARK from program participation were merely negligent, then Alabama, by statutory enactment, has removed the shield of qualified immunity from such negligent conduct.   Ala Code § 11-47-190 provides a state waiver of immunity where "such injury or wrong was done or suffered through the neglect, carelessness" of municipal employees.

### COUNT  TEN:

### FREE SPEECH PROVISION  OF STATE CONSTITUTION
### Claim is brought against the County Commissioners, and, Administrator Pafenbach, individually ON behalf of SouthBARK and Emily Thompson

The above paragraphs are generally re-pleaded and re-averred; however, Plaintiff specifically re-pleads paragraphs 84 to 89 above, and by express reference, are incorporated herein.

**103.**  Section 4, Alabama Constitution of 1901, as amended, provides citizens of this state "free speech" rights.  As an aid in interpreting the scope of § 4, the state courts look to the body of federal law interpreting the first amendment.  See generally *Ford v. Jefferson County*, 904 So.2d 300 (Ala. Civ. App. 2004).   By suspending SouthBARK, due to its President speaking out on matters of public concern, the defendants, referenced in this Count, retaliated against this corporation, in violation of § 4, for which Alabama law provides a remedy.

## COUNT ELEVEN:

### FREE SPEECH PROVISION OF STATE CONSTITUTION
Claim is brought against the County Commissioners; Commissioner Hudson, individually; and, Administrator Pafenbach, individually ON behalf of SouthBARK and Emily Thompson

The above paragraphs are generally re-pleaded and re-averred; however, Plaintiff specifically re-pleads paragraphs 90 to 94 above, and by express reference, are incorporated herein.

**104.**  Section 4, Alabama Constitution of 1901, as amended, provides citizens of this state "free speech" rights.  As an aid in  interpreting the scope of § 4, the state courts look to the body of federal law interpreting the first amendment.  See generally *Ford v. Jefferson County*, 904 So.2d 300 (Ala. Civ. App. 2004).   By terminating SouthBARK due to its volunteers, via Facebook and other social media, speaking out on matters of public concern, the defendants, referenced in this Count, retaliated against this corporation, in violation of § 4, for which Alabama law provides a remedy.

## COUNT TWELVE:

### FREE SPEECH PROVISION OF STATE CONSTITUTION
Claim Solely Against Commissioner Ludgood ON behalf of SouthBARK and Emily Thompson

The above paragraphs are generally re-pleaded and re-averred;

**105.**  Section 4, Alabama Constitution of 1901, as amended, provides citizens of this state "free speech" rights.  As an aid in interpreting the scope of § 4, the state courts look to the body of federal law interpreting the first amendment.  See generally *Ford v. Jefferson County*, 904 So.2d 300 (Ala. Civ. App. 2004).  By refusing to reinstate SouthBARK due to its President speaking out on matters of public concern, this

38

defendant retaliated against this corporation in violation of § 4, for which Alabama law provides a remedy.

## COUNT THIRTEEN:

### STATE COMMON LAW DEFAMATION
### Claim brought against Commissioner Hudson, Administrator Pafenbach and Nancy Johnson, all in their individual capacities ON behalf of SouthBARK

The above paragraphs are generally re-pleaded and re-averred; however,

106.   Under Alabama law, defamation consist of the following elements: '(1) a showing that the defendants were at least negligent with respect to their loose comments about the plaintiff; *Mead Corp. v. Hicks*, 448 So.2d 308 (Ala.1983); (2) that there was a publishing of (3) a false and defamatory statement to another; (4) concerning the plaintiff; (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod):  *Albert Miller & Co. v. Corte*, 107 F.2d 432 (5th Cir.1939)." The above referenced defendants by their acts described in detail in paragraphs 103 thru 106 have defamed the Corporate Plaintiff, for which state law provides a remedy.

## COUNT FOURTEEN:

### STATE COMMON LAW NEGLIGENCE
### Claim brought against all defendants

The above paragraphs are generally re-pleaded and re-averred.

107. The defendants owed the Corporate Plaintiff a duty of care.  This duty included the responsibility to not accidently remove SouthBARK from their animal rescue program, and further included a duty to not carelessly make public comments which were not true, and which were reasonably foreseeable to cause SouthBARK to be stigmatized in the community and to suffer the loss of its reputation.  The defendants,

by their acts as described herein, breach that duty.  The Corporate Plaintiff suffered injury as a direct result of that breach for which it is entitled to damages**.**

## PRAYER FOR RELIEF

**WHEREFORE,**   Above premises considered, SouthBARK, and Dusty, to the extent applicable to her, prays for the following relief:

**A.** That the Court accepts and keeps jurisdiction over this cause;

**B.**  That after a hearing, declare that defendants, or any one or more of them, violated the Corporate Plaintiff's free speech rights when it suspended it from participation in defendants' animal rescue program;

**C.**   That after a hearing, declare that defendants, or any one or more of them, violated the Corporate Plaintiff's free speech rights when it permanently terminated it from participation in defendants' animal rescue program;

**D.**   After a hearing issue a preliminary injunction enjoining the defendants from euthanizing any non-sick, non-injured-and non-dangerous animals housed and/or to be housed in its animal rescue facility pending the outcome of this litigation;

**E.**   Award to the Corporate Plaintiff compensatory damages in the amount of $500.000.00 or any such lesser or greater amount as is proved at trial;

**F.**  Award Corporate Plaintiff interest on its compulsory damages in the amount of 12 percent per year;

**G.**  Award Corporate Plaintiff punitive damages, as appropriate and as is permitted by law, from the individually named defendants;

**H.**  Award Plaintiffs their costs and expenses;

**I.**   Award Plaintiffs their  attorney reasonable attorney fees consistent with his experience and years of practice pursuant to 42 U.S.C. 1988, and any other appropriate federal fee shifting statute; and

**J.**  Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Respectfully submitted

Done this 24th day of June 2013.

s/s Ishmael Jaffree
Ishmael Jaffree, (Jaff 002)
Attorney for Plaintiff
800 Downtowner Blvd. Ste 106 B
Mobile Alabama 36609
251-694-9090
ishjaff@gmail.com

### CERTIFICATE OF SERVICE

I hereby that on this 24th day of June 2013, I forwarded a copy of Plaintiffs' First Amended Complaint to the defendants via the Court's electronic filing system  which automatically will serve all counsel of record.

s/s Ishmael Jaffree
Ishmael Jaffree