IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SOUTHBARK, INC., *et al.*,          :
                                    :
    Plaintiffs,              :
                                    :
vs.                                 :
                                    :     CIVIL ACTION 13-0183-KD-M
MOBILE COUNTY COMMISSION,            :
*et al.*,                           :
                                    :
    Defendants.              :

REPORT AND RECOMMENDATION

The Partial Motion to Dismiss filed by Defendants (Doc. 30) has been referred for report and recommendation, under 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2.  Jurisdiction has been invoked in this Court under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331 and 1367 (Doc. 28, ¶ 3).[1]  After consideration, it is recommended that Defendants' Motion (Doc. 30) be granted insofar as it seeks to have Plaintiff Dusty Feller dismissed as a party; it is further recommended that the Motion be granted as to counts six (§ 1983 defamation), seven (§ 1983 defamation), and fourteen (negligence) and that those claims be dismissed.

The facts are, briefly, as follows.  Plaintiff SouthBARK,

---

[1]Under § 1367, Plaintiffs seek this Court's review of their State claims against the Defendants.

Inc. is a non-profit charitable corporation "formed solely to rescue . . . animals from shelters that regularly euthanize them because of space limitations" (Doc. 28, ¶ 6). Plaintiffs Dusty Feller (hereinafter *Dusty*) and Emily Thompson are SouthBARK's Vice President and President, respectively (*id.* at ¶¶ 8, 11). Defendant Mobile County Commission (hereinafter *Commission*) is the governing body for Mobile County, Alabama and is made up of three commissioners, including Defendants Merceria L. Ludgood and Connie Hudson, the current and immediate past Commission Presidents (Doc. 28, ¶¶ 17-20). Defendant John Pafenbach is the Commission Administrator, "responsible for managing the daily operations" for the County (*id.* at ¶ 21). Defendant Nancy Johnson serves as the County's Public Affairs/Community Service Director (*id.* at ¶ 22). The Mobile County Animal Shelter (hereinafter *MCAS* or *Shelter*) is a facility, governed by the Commission, that handles abandoned animals in Mobile County (*id.* at p. 8 n.2).

SouthBARK's "goal is to save abandoned, abused, neglected and homeless animals" (*id.* at ¶ 6). In the past, SouthBARK has acquired dogs from MCAS's kennels and found foster homes for them, preventing their being euthanized (*id.* at ¶¶ 24-25). For a period of six months, MCAS denied SouthBARK access to the Shelter, allegedly because of statements made by SouthBARK volunteers concerning the number of animals being regularly

euthanized and because one volunteer threatened a Shelter worker (*id.* at ¶¶ 30-32).  Following this "cooling off period," SouthBARK's access to MCAS—and its animal rescue operation—resumed (*id.* at ¶¶ 32-33).  On August 30, 2012, "SouthBARK received a letter from Defendant Pafenbach advising that the animal rescue group would no longer be able to participate in acquiring animals from the Shelter" (*id.* at ¶ 41).

On April 12, 2013, SouthBARK and Dusty brought this action (Doc. 1).  On June 24, 2013, Plaintiffs filed an Amended Complaint, adding Thompson as a Party; fourteen claims, both State and Federal, were raised in the Amended Complaint (Doc. 28; *see also* Doc. 27).  On July 8, the Defendants filed a Partial Motion to Dismiss (Doc. 30) which seeks to have Dusty dismissed as a Party and seven of Plaintiffs' fourteen claims dismissed (Doc. 30).  Plaintiffs have responded to the Motion (Doc. 34) to which the Defendants have replied (Doc. 36).

The Court notes, initially, that "[w]hen considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir. 1993)).  In order to state a claim for relief, the Federal Rules of Civil Procedure state that a pleading must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The U.S. Supreme Court explained that the purpose of the rule was to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).[2] While factual allegations do not have to be detailed, they must contain more than "labels and conclusions;" "a formulaic recitation of the elements of a cause will not do." *Bell Atlantic Corporation v. Twombley*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Facts that are 'merely consistent with' the plaintiff's legal theory will not suffice when, 'without some further factual enhancement [they] stop short of the line between possibility and plausibility of "entitle[ment] to relief."'" *Weissman v. National Association of Securities Dealers, Inc.*, 500 F.3d 1293, 1310 (11th Cir. 2007) (quoting *Twombley*, 550 U.S. 557) (quoting *DM Research, Inc. v.*

---

[2] *Conley* also stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46. The U.S. Supreme Court has done away with this standard in *Bell Atlantic Corporation v. Twombley*, 550 U.S. 544, 557-563 (2007). The Court, nevertheless, finds *Conley*'s statement regarding the purpose of Rule 8(a)(2) to be useful here in deciphering the analysis necessary for evaluating Plaintiff's claims.

*College of American Pathologists*, 170 F.3d 53, 56 (1st Cir.
1999)).  "Only a complaint that states a plausible claim for
relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556
U.S. 662, 679 (2009) (citing *Twombley*, 550 U.S. at 556).  "Where
the well-pleaded facts do not permit the court to infer more
than the mere possibility of conduct, the complaint has alleged—
but it has not 'show[n]'—'that the pleader is entitled to
relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P.
8(a)(2)).  As noted by the Supreme Court, Plaintiffs must
"nudge[] their claims across the line from conceivable to
plausible[; otherwise,] their complaint must be dismissed."
*Twombly*, 550 U.S. at 570.[3]  It is noted, however, that a
complaint may be dismissed, under Federal Rule of Civil
Procedure 12(b)(6), "on the basis of a dispositive issue of
law."  *Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1539
(11th Cir.) (citing *Neitzke v. Williams*, 490 U.S. 319 (1989)),
*cert. denied*, 502 U.S. 810 (1991).

In their Partial Motion to Dismiss (Doc. 30), Defendants
first assert that Dusty does not have standing to maintain this
action (Doc. 30, pp. 7-10).  Their argument is two-fold:  (1)

---

[3]Plaintiffs have asserted that *Twombly* and *Iqbal* have no
application to their State claims as "no state review court has
adopted this heightened standard for Alabama state claims" (Doc. 34,
p. 16).  The Court finds no merit in this assertion and rejects it.

Dusty does not have individual standing; and (2) Dusty does not have standing to assert claims on behalf of the animals at the MCAS (*id.*).

The Court notes that "a plaintiff must have standing to invoke the jurisdiction of the federal courts." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006). "To demonstrate standing, a plaintiff must show that '(1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to [the actions of the Defendants]; and (3) a favorable judgment is likely to redress the injury.'" *Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services*, 648 F.3d 1235, 1242-43 (11th Cir. 2011) (*quoting Harrell v. The Florida Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010)), *reversed, in part, sub nom. National Federation of Independent Business v. Sebelius*, --- U.S. ---, 132 S.Ct. 2566 (2012). "'The plaintiff bears the burden of establishing each of these elements.'" *Florida ex rel. Atty. Gen.*, 648 F.3d at 1243 (*quoting Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*quoting Lujan v. National Wildlife Federation*, 497 U.S.

871, 889 (1990)).  "'[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.'"  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir.), *cert. denied*, 546 U.S. 872 (2005) (citations omitted).  This Court is "obliged to consider questions of standing regardless of whether the parties have raised them."  *Bochese*, 405 F.3d at 975.  However, "so long as at least one plaintiff has standing to raise each claim [] we need not address whether the remaining plaintiffs have standing."  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1244.

The Court has carefully reviewed the Amended Complaint and notes that Plaintiff Dusty is referenced within that pleading only as follows:

> 7.  <u>Dusty Dean Feller</u> (Dusty).  Dusty's love of and compassion for dogs and cats (affectionately referred to as "companion animals") is lifelong; coming full bore from an animal loving family background.  Because of this animal loving background, Dusty shares the view that the human race domesticated these animals, made them dependent upon us and, thus, it is our responsibility to insure that they "live long and prosper."  Currently, she has three dogs:  15 year old Labrador Retriever; a 6 year old Bull Mastiff; and a 1 year old Yorkie.
> 8.  Dusty became affiliated with Plaintiff SouthBARK during the month of June 2011.  She became its Vice President shortly thereafter.  Initially, her general day to day involvement with the organization's rescue efforts included picking up dogs that

SouthBARK pulled (retrieved) from the Shelter and taking them to other "no kill" shelters, foster homes, or adopters. Further, she accomplished SouthBARK's President, Emily Thompson, to meetings where, among other things, the two of them collectively offered suggestions and raised questions/concerns about the shelter to Shelter staff.

9.  Dusty became more active in the political side of things when the shelter blatantly starting changing policies, euthanizing dogs that had been rescue, or simply, because they had overstayed their welcome.  They euthanize dogs and cats for a runny nose or a skin condition; easily treatable conditions.  Shelter personnel claimed animal aggression, thereby justifying euthanization, when, in fact, the animal was just scared.

10.  Plaintiff Feller files this action on behalf of herself, SouthBARK, and the animals housed currently in defendants' animal shelter, and will be housed in the future in the Mobile County Animal Shelter. On her own behalf, she prays for solely declaratory and ultimately permanent injunctive relief.  Any damages sought are being sought by and on behalf of the nonprofit corporation.

***

23.  SouthBARK is a network of foster homes, which means all of these former shelter dogs live in its' volunteer's homes with their families and their other pets.  Volunteers including Dusty and Emily get to know the rescued animals extremely well.  Volunteers have to get the animals over any illnesses they have contracted or injuries they have sustained, get them vaccinated, spayed, neutered, and de-wormed.  Emily Dusty and other volunteers drive the animals around in their cars.  Frequently, the animals sleep in the volunteer's beds, they bathe them in their tubs feed and nurture them.

\*\*\*

33. Due to the arrival of a new Shelter director, SouthBARK was permitted to resume rescuing animals.  However, a few months later, at the end of June, 2012, Dusty Feller, SouthBARK's Vice President, arranged a meeting for SouthBARK and other members of the rescue community, to discuss the Shelter with Defendant, County Commissioner Hudson. Dusty and Emily raised several questions about the Shelter staff's ability to handle questions concerning animal availability for adoption; lack of staff training; and intervention strategies for dogs slated for euthanasia.

\*\*\*

44.  Defendant Pafenbach, as well as other officials associated with the Shelter, are well familiar with Emily and Dusty.  If these two were the ones threatening, in some unspecified manner, he could have stated such.  SouthBARK is supported by over 100 loosely affiliated volunteers.  Neither of these officers can control their volunteers' free speech, nor would they desire to do so. Are SouthBARK's volunteers zealous? Absolutely.  But that is exactly what we want in a free, vibrant society. Our public officials are elected or selected—not anointed.

\*\*\*

51.  SouthBARK's Vice President went immediately to the shelter and gathered all of the dogs and took them to a safe location.  A few days later, Dusty and Johnny Hatcher met with Defendant Hudson, and Defendant Pafenbach.  Dusty thanked Pafenbach for allowing his staff to call SouthBARK to save the dogs.  Pafenbach's response to Dusty, in front of Commissioner Hudson and Johnny, was:  "Please don't thank

me. That will never happen again. That was a huge mistake and I am so sorry to have gone against the Commission by calling SouthBARK." True to his word, SouthBARK was not to be called again. Commissioner Hudson did not correct him.

52. One final act of retaliation, by a Commissioner, occurred on February 20, 2013, less than three weeks after SouthBARK had bailed the Shelter out of a potentially embarrassing, and for the dogs involved, lethal, situation. On this day, SouthBARK's Vice President and her friend Hatcher visited Commissioner Ludgood, in yet a further attempt to have SouthBARK reinstated to the program. Commissioner Ludgood advised them that the organization would not receive her support for reinstatement because she had received work that Emily was a "racist." This comment, with its oppressive and repulsive overtones, was unsupported with particulars, and was, at best, premised upon hearsay. Yet, this vicious rumor formed the stated basis for this defendant's continuing denial of SouthBARK's program participation.

***

55. Preceding Feller's meeting with Ludgood was a meeting on February 14, 2013 was a meeting with Commissioner Hudson and County Administrator, John Pafenbach. During this meeting, Feller, on behalf of SouthBARK, fell on her sword and promised that the non-profit, in the future, would self censer itself and its volunteers by monitoring future Facebook listing to insure that no future offensive publications occur. These defendants would not be moved by this action of attrition and steadfastly refused to permit SouthBARK to rescue animals from its shelter. At no time during these discussions did either of these defendants deny that the Facebook postings were the reason in fact for the ban.

\*\*\*

<u>COUNT EIGHT</u>:  DECLARATORY WITH RESPECT
        TO SOUTHBARK'S INDIVIDUAL CLAIM
        Claim attaches to all defendants

99.  SouthBARK, Dusty and Emily seek, and
are entitled to, a declaration that
SouthBARK was denied participation in the
County's animal rescue program in
retaliation for speech by its volunteers
which was protected by the first amendment,
but which the defendants found offensive or
otherwise unsatisfactory.  To ameliorate the
harsh effects of this decision, and to
prevent similar decisions in the future.
SouthBARK and Dusty seek, after trial a
permanent injunction, restraining,
defendants from denying to it the privilege,
as is enjoyed by other rescue organizations,
to rescue animals, to the extent of its
ability and the availability of animals
detained in defendants' animal shelter.

(Doc. 28).

The Court finds that Dusty has failed to allege that she

"has suffered, or imminently will suffer, an injury-in-fact" in

the Amended Complaint as required in *Florida ex rel. Atty. Gen.*

Plaintiff comes closest to satisfying this requirement in ¶ 99

in which she, along with Emily and SouthBARK, seeks this Court's

declaration that they were denied participation in the animal

rescue program.

As noted by District Judge DuBose, though, in her June 20,

2013 Order denying their request for injunctive relief,

Plaintiffs "have continued to adopt animals from the MCAS

through other animal rescue groups" (Doc. 26, p. 6). This
finding is confirmed in the Amended Complaint which asserts that
"[t]he Defendants have relented slightly by permitting certain
volunteers, except Emily, to pull animals from its shelter, but
only if they are doing so on behalf of another rescue partner"
(Doc. 28, ¶ 56). This specific language suggests that Dusty is
a volunteer who participates in rescuing animals; in any event,
the language does not indicate that she is being denied the
opportunity. This belies any assertion of injury. As held in
*Sierra Club v. Morton*, 405 U.S. 727, 734-35 ((1972), "the
'injury in fact' test requires more than an injury to a
cognizable interest. It requires that the party seeking review
be himself among the injured." Plaintiff Dusty has not met this
requirement.

Plaintiffs have argued that because Defendants do not
challenge the standing of either SouthBARK or Thompson, and
thereby concede their standing, it is unnecessary for the Court
to consider Dusty's standing under *Florida ex rel. Atty. Gen.*,
(Doc. 34, p. 10). Nevertheless, Dusty's standing has been
considered and has been found wanting. However, there is still
another issue to consider.

As noted previously, the Amended Complaint states that
Dusty is filing "this action on behalf of . . . the animals
housed currently in defendants' animal shelter, and will be

housed in the future in the Mobile County Animal Shelter" (Doc. 28, ¶ 10). However, Defendants have asserted that the "animals do not have standing and Plaintiffs have no standing to assert the rights of those animals on their (the animals) behalf" (Doc. 36, p. 2 n.1; *see also* Doc. 30, p. 10).

Plaintiffs have not provided any authority that would support a holding that the animals that are currently at the MCAS—or that will be there in the future—have standing in this action. Furthermore, there has been no showing of authority granting Plaintiffs the ability to stand in their place. The Court has not independently found any such holding. In fact, what authority has been found rules otherwise. *See Cetacean Community v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (*quoting Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium*, 836 F.Supp. 45, 49 (D. Mass. 1993)) ("'[i]f Congress and the President intended to take the extraordinary step of authorizing animals as well as people and legal entities to sue, they could, and should, have said so plainly.' In the absence of any such statement in the [Endangered Species Act], the [Marine Mammal Protection Act], or [National Environmental Policy Act], or the [Administrative Procedure Act], we conclude that the Cetaceans do not have statutory standing to sue"). This Court notes, however, that the law provides that the Plaintiffs here, once having established standing in their own

13

right, can argue the public interest of protecting the animals housed at the Shelter. *See Sierra Club*, 405 U.S. at 737. Nevertheless, Plaintiff Dusty will not be making that argument.

The Court finds that Dusty has failed to allege an injury sufficient to satisfy the requirements for standing to continue as a Plaintiff in this action. As such, it is recommended that Defendants' Motion to Dismiss (Doc. 30) be granted to the extent that it seeks to have Dusty dismissed as a Plaintiff.

Defendants also seek to have this Court dismiss a number of claims brought by the Plaintiffs. More specifically, Defendants seek to have claims six, seven, thirteen, and fourteen dismissed for Plaintiffs' failure to state claims under Fed.R.Civ.P. Rule 12(b)(6) (Doc. 30, pp. 11-19). Defendants further seek to have claims one, two, and ten dismissed because they "assert nothing more than mere labels and legal conclusions" (Doc. 30, p. 20). The Court will begin with the 12(b)(6) claims.

In count six of the Amended Complaint, SouthBARK claims § 1983 defamation under the "stigma plus" test. The U.S. Supreme Court has stated that, in examining a § 1983 action, one must look to see that the two essential elements are present: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parratt v.*

*Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330-331 (1986).

The first question to be asked, in examining a § 1983 claim, is "whether the conduct complained of was committed by a person acting under color of state law." *Id.* Under Alabama statutory law, Mobile is a county and, as such, is a body corporate with power to sue or be sued. Ala. Code §§ 11-1-1 and -2. Furthermore, Alabama law states that "[i]t shall be the duty of each and every county in the state to provide a suitable county pound and impounding officer for the impoundment of dogs and cats found running at large." Ala. Code § 3-7A-7. The Court finds state action for purposes of continued examination of these claims, noting that while Defendants have cast doubt on Plaintiff's ability to prove this claim, they have not challenged the assertion that the action was State action (*see* Docs. 30, 36).

The second element to be considered in a § 1983 action is "whether this conduct deprived [Plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parratt*, 451 U.S. at 535. In the Complaint, SouthBARK asserts that it "was deprived of both the liberty interest in protecting at-risk animals, and a property interest in the animals themselves" (Doc. 28, ¶ 94).

The Court notes that "defamation by the government,

15

standing alone and apart from any other governmental action,
does not constitute a deprivation of liberty or property under
the Fourteenth Amendment. *Cannon v. City of West Palm Beach*,
250 F.3d 1299, 1302 (11th Cir. 2001) (*citing Paul v. Davis*, 424
U.S. 693, 694 (1976)). In what came to be known as the "stigma-
plus" test, the *Paul* Court held that "a plaintiff claiming a
deprivation based on defamation by the government must establish
the fact of the defamation 'plus' the violation of some more
tangible interest before the plaintiff is entitled to invoke the
procedural protections of the Due Process Clause." *Cannon*, 250
F.3d at 1302 (*citing Paul*, 424 U.S. at 702-02). "'To establish
a liberty interest sufficient to implicate the fourteenth
amendment safeguards, the individual must be not only
stigmatized but also stigmatized in connection with a denial of
a right or status previously recognized under state law.'"
*Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir.
2003) (*quoting Cannon*, 250 F.3d at 1302) (*quoting Moore v.
Otero*, 557 F.2d 435, 437 (5th Cir. 1977)).

Under Alabama statutory law, "[a]**t his discretion**, the []
impounding officer may sell any dog or cat not redeemed or
claimed or otherwise disposed of, **to any purchaser** desiring the
said animal, which said purchaser must comply with all the
provisions of this chapter." Ala. Code § 3-7A-8 (emphasis
added). This language indicates that although SouthBARK might

16

wish to avail itself of the opportunity to take possession of animals, rescuing them from possible death and providing them homes, Plaintiff does not have a right to do so and never did. It is within the sole discretion of the County Impounding Officer to decide who will get the animals.

Plaintiffs have responded to Defendants' Motion to Dismiss, arguing that a claim for defamation has been made under Alabama law (Doc. 34, pp. 14-21).  However, no argument has been put forth as to why the § 1983 defamation claim should not be dismissed.  The Court finds that SouthBARK has not shown that it has been deprived of a constitutional right necessary to sustain its ¶ 1983 claim for defamation as Plaintiff has failed to demonstrate that it has been denied a right previously recognized by State law.  Therefore, it is recommended that count six of the Amended Complaint be dismissed pursuant to Defendants' Motion to Dismiss (Doc. 30).

In count seven of the Amended Complaint, Plaintiffs make another claim for defamation (Doc. 28, ¶¶ 95-98).  The title indicates that the claim is brought under § 1983, though the arguments consist entirely of Alabama law.  The concluding line of the argument, however, states as follows:  "SouthBARK, having lost a tangible property interest and having suffered public stigma due to the published comments of these defendants, have stated a cause under the fourteenth amendment due process clause

of the Constitution; the violation of which 42 U.S.C. § 1983
provides a remedy" (Doc. 28, ¶ 98).

The Court notes that Plaintiffs raise another claim of
defamation, count thirteen, which again argues the elements
under Alabama law (Doc. 28, ¶ 106).  In count thirteen, however,
there is no mention of federal law or § 1983.

The Court finds that Plaintiffs apparently intend to bring
count seven of the Amended Complaint as a § 1983 claim.  As
SouthBARK has not shown that it has been deprived of a
constitutional right, previously recognized by State law,
necessary to sustain its ¶ 1983 claim for defamation, as
discussed previously herein, the Court recommends that count
seven of the Amended Complaint be dismissed pursuant to
Defendants' Motion to Dismiss (Doc. 30).

In count thirteen of the Amended Complaint, SouthBARK
asserts that is has been defamed by Defendants under Alabama law
(Doc. 28, ¶ 106).  "The general definition [of defamation] may
be said to include whatever tends to injure the character of an
individual, blacken his reputation, or imputes fraud,
dishonesty, or another moral turpitude, or reflects shame, or
tends to put him without the pale of social intercourse."
*Bowling v. Pow*, 301 So.2d 55, 59 (Ala. 1974).  A *prima facie*
case of defamation, under Alabama law, requires that a plaintiff
show "that the defendant was at least negligent [] in publishing

18

a false and defamatory statement to another concerning the plaintiff [] which is either actionable without having to prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm (actionable *per quod*)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1091 (Ala. 1988) (citations omitted). Publication requires communication of the defaming statement to only a single third party. *See Brackin v. Trimmier Law Firm*, 897 So.2d 207, 221 (Ala. 2004).

The Court notes that the negligence standard is applicable for private figures. *Nelson*, 534 at 1092, n.2. Defendants argue, however, that SouthBARK is not a private figure—but is a public figure—and that the proper burden for Plaintiff is to demonstrate "actual malice" to prove its claim (Doc. 30, pp. 14-15).

The United States Supreme Court has explained that there are two different types of public figures:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Defendants point to a number of statements in the Amended Complaint as support for their argument that SouthBARK falls within the second category of public figures (Doc. 30, pp. 14-15).  Those statements follow.

On January 26, 2011, Plaintiff Thompson sent an e-mail to Defendant Johnson that "SouthBARK 'doesn't intend to slow down (its) efforts at MCAS, or stop letting the public know when we have had an animal fall through the cracks on our watch'" (Doc. 28, ¶ 30).  In that same e-mail, Thompson acknowledges that local media had approached her about concerns SouthBARK had about the treatment of animals at the Shelter (*id.*).  The Amended Complaint states that "SouthBARK has publicly, and frequently, complained about Mobile County's 'kill rate,' and has tirelessly attempted to get the Shelter to develop a 'no kill' policy" (Doc. 28, ¶ 26).  "SouthBARK is not just a rescue organization; it also has, as its mission, to speak out forcibly about instances of animal abuse, neglect and needless euthanization.  It was this propensity for speaking out publically, on animal abuse . . ." (Doc. 28, ¶ 29).  SouthBARK conducts a public forum, monitored on a regular basis, in which it "urgently solicit[s] members of the public [to] get [] involved in SouthBARK's rescue efforts to save dogs slated to be put to death by the Shelter;" there are approximately 7,000 subscribers to this forum (Doc. 28, ¶ 25; *see generally* ¶¶ 36-

38).  In the Amended Complaint, Plaintiffs state that the "needless destruction of companion animals" is a matter of public concern (Doc. 28, ¶ 40).

The Court finds that these statements in the Amended Complaint confirm Defendants' assertion that SouthBARK is a public figure under *Gertz*'s second definition.  That is, SouthBARK is a group that has voluntarily injected itself into a public controversy, becoming a public figure for a limited range of issues.  Those issues are the subject matter of this action.  So, it will be necessary for Plaintiff to demonstrate "actual malice" to prove its claim.  The United States Supreme Court has stated that when someone speaks with "actual malice," it means that the person is speaking "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).

In the Amended Complaint, count thirteen set outs the elements of the Alabama law of defamation and concludes with the following sentence:  "[t]he above referenced defendants by their acts described in detail in paragraphs 103 thru 106 have defamed the Corporate Plaintiff, for which state law provides a remedy" (Doc. 28, ¶ 106).  The Court finds nothing in ¶¶ 103-06 which provides factual circumstances of any Defendant publishing an untrue statement that defamed SouthBARK; likewise, there is nothing there indicating actual malice.

Based on this failure to demonstrate the defamation it claims in §§ 103-06, the Court's inclination is to recommend that Defendants' Motion to Dismiss be granted as to claim thirteen for defamation under Alabama law. However, recognizing that most of the factual assertions were made early in the Amended Complaint and were not linked to specific claims, the Court will review that document in its entirety, looking specifically for factual assertions of defamation that have been scattered throughout. The following is what the Court found and will form the basis for the rest of this discussion:

> 41. Three days later (August 30, 2012) SouthBARK received a letter from Defendant Pafenbach advising that the animal rescue group would no longer be able to participate in acquiring animals from the Shelter. The letter advised that due to repeated (unidentified) incidents of disruptive Shelter operations "SouthBARK and/or its officers and members, will no longer be able to acquire dogs." No further specification was provided.
>
> 42. On September 6, 2012, Emily returned a call from Nancy Johnson who reaffirmed that SouthBARK would no longer be able to obtain dogs. When questioned why, Nancy's response was "the same reasons as last year."
>
> 43. This is consistent with statements that Defendant Pafenbach made publically at a County Commission meeting on September 13, 2012:
>
> > **Pafenbach:** In February 2011, the situation with SB (SouthBARK) had deteriorated so much that we met with Miss Thompson and her attorney to discuss the problems and we were not even able to agree that there were

problems, much less try to promote any type of resolution to them. So at that time, I asked them to stay away for 6 months to give us a cooling down period in hopes that they would come to understand that the county is required by law to operate a shelter, that certain standards are required by law to operate a shelter, that certain standards are required of the county, and there is a responsibility to the community and we hoped they would come back with sincere efforts to work with us, not against us. At the end of the 6 months, they came back with a sense they would abide by our rules. Almost immediately we began experiencing the same types of problems that had led to the 6 month cooling off period. This went on and on and finally earlier this year it got to the point that it was an everyday thing they were experiencing. So went to the commission recently and advised them my recommendation was to ban SB from the Shelter. This was based not only on the problems they were causing our employees, it had gotten so bad that our employees were working in an environment of intimidation, harassment, they were being bullied by SB members, but we also had other rescue groups questioning whether or not they could work with us. Not just rescue groups, we had veterinarians, professional medical people who volunteered their time to help us at the shelter questioning whether or not they could continue under these conditions. So I went back to the commission as I said and the commission supported that decision.

Later, at that same public hearing, referring either to SouthBARK's officers of volunteers, he added this comment: "they are repugnant."

***

45.  At the September 13 public meeting, Defendant Hudson spoke in the same vein as did Defendant Pafenbach:

> **Connie Hudson:**  And we have seen these, we have all seen these, and it just, you know there is a lot of good this group does and I commend the adoptions, if only we could take the good and leave out the bad, I would be all for this, but cannot knowingly allow people that go to work every day to be bullied.  Right now in America there is a push all across this country to stop bullying in classrooms.  Well the work place is no different.  People do not deserve to be bullied and harassed while they're trying to do their job, and they're trying to do a good job.  And you may not realize, I think there are a lot of people involved in this organization that don't realize some of the context of the information that is going out there or being said about people.  You know if you, it just, it crosses the line, ladies and gentleman, and I would, I'm not gonna sit here and say that we can't do something down the road.

46.  On September 17, 2012, a few weeks after terminating SouthBARK's program participation, county employees acknowledged to the Mobile Press Register, an awareness of SouthBARK's facebook posting, as is evidence form the following defamatory excerpts from the publication:

> The Mobile County Commission is sticking by its ban of SouthBARK, a prolific but controversial rescue group, saying the group's behavior is too extreme to justify allowing it to continue working with the county.
>
> The County released a series of online chat transcripts that appeared to have been pulled from SouthBARK's private Facebook page.  Nancy Johnson,

24

a spokeswoman for the county, said the
messages were forwarded from a member
of the Facebook group.

The chats show members calling
shelter employees names, questioning
their devotion to the animals and, in
one case, accusing a high-ranking
shelter official of getting her job by
sleeping with a county official.

One employee was called "a waste
of human flesh" that someone should
"neuter . . . tie him to a tree with a
collar on his neck staked with a heavy
chain and no food, water and definitely
no shelter from the elements."  Johnson
said the messages, though gleaned from
an ostensibly private chat room, show
that SouthBARK has been acting in bad
faith with no sincere intention to work
with county officials.

47.  Defendant Nancy Johnson, Pubic Affairs
Director for the County, in an article dated
September 8, 2012, published in the Mobile
Press Register, affirmed that the same
public disclosure of unwelcome facts which
resulted in the earlier suspension, mothered
the August 30, 2012 termination:  "We made
the decision to end the association because
SouthBARK continually disrupted the
operations of the Mobile County Animal
Shelter to the point where their association
is doing more harm than good in our efforts
to shelter these unwanted animals by its
failure to abide by the rules and protocols
which all other partners honored."
Defendant Hudson is reported in the same
interview as stating "that the group
(SouthBARK) was putting out false
information about the Animal Shelter."

48.  In an article written by Robert
McClendon, Mobile Press-Register, dated
September 14, 2012, he reports that:
"County Commission President Connie Hudson
stated that it was a shame that the county
couldn't get "the good without the bad,"
because SouthBARK was providing an important
service.  However, she said, "We cannot

> knowingly send people to work every day to
> be bullied." Hence, she repeated, in the
> press conference, what she had said at the
> Commission's public meeting on September 13,
> 2012.
>
> ***
>
> 51. SouthBARK's Vice President went
> immediately to the shelter and gathered all
> of the dogs and took them to a safe
> location. A few days later, Dusty and
> Johnny Hatcher met with Defendant Hudson,
> and Defendant Pafenbach. Dusty thanked
> Pafenbach for allowing his staff to call
> SouthBARK to save the dogs. Pafenbach's
> response to Dusty, in front of Commissioner
> Hudson and Johnny, was "Please don't thank
> me. That will never happen again. That was
> a huge mistake and I am so sorry to have
> gone against the Commission by calling
> SouthBARK." True to his word, SouthBARK was
> not to be called again. Commissioner Hudson
> did not correct him.

(Doc. 28).[4]

The Court notes that the communications in ¶¶ 41-42 are

between a Plaintiff and one of the Defendants and are not made

to a third party. This fails to satisfy the requirement that

the statement be made to another person under *Brackin*.

In ¶¶ 43 and 45, Defendants Pafenbach and Hudson made

statements at public meetings that members of SouthBARK were

bullies who harassed MCAS employees. Assuming the truth of

---

[4]The Court notes that this list appears to correspond to the same
incidents discussed by Defendants (*see* Doc. 30, p. 16).

Plaintiff's assertions, the Court finds that these circumstances satisfy the minimal requirements for a showing of defamation under *Nelson*. Furthermore, the Court finds that Defendants' statements about SouthBARK's volunteers being harassing bullies could be considered to have been made with actual malice, as contemplated in *Sullivan*, if the statements are not true.

In ¶¶ 46-48, media sources are reporting the events, essentially, of ¶¶ 43 and 45. The news stories, however, contained statements by Defendants that could be considered to be defamation for purposes of this Motion.

The Court finds no defamation in ¶ 51 as no statement is actually made about SouthBARK.

In summary, statements made by Defendants in ¶¶ 43, 45, 46, 47, and 48 could be construed as defamatory. The statements made against SouthBARK could also be understood to have been made with actual malice. Having determined that these statements could be considered defamatory, "'it is then for the jury to say whether [the statements were] in fact so understood.'" *Camp v. Yeager*, 601 So.2d 924, (Ala. 1992) (*quoting* W. Page Keeton, *et al.*, *Prosser and Keeton on Torts* § 111, at 781 (5th ed. 1984)), *cert. denied*, 506 U.S. 1049 (1993). Therefore, it is recommended that Defendants' Motion to Dismiss

(Doc. 30) be denied as to Plaintiffs' claim of defamation under Alabama law (count thirteen).[5]

Defendants also seek to dismiss Plaintiffs' claim of negligence (count fourteen) (Doc. 30, pp. 19-20).  The entire claim states as follows:

> 107.  The defendants owed the Corporate Plaintiff a duty of care.  This duty included the responsibility to not accidently removed SouthBARK from their animal rescue program, and further included a duty to not carelessly make public comments which were not true, and which were reasonably foreseeable to cause SouthBARK to be stigmatized in the community and to suffer the loss of its reputation.  The defendants, by their acts as described herein, breach that duty.  The Corporate Plaintiff suffered injury as a direct result of that breach for which it is entitled to damages.

(Doc. 28).

With regard to its removal from the animal rescue program, the Court has already shown that, under Ala. Code § 3-7A-8, the

---

[5]Defendants have asserted that Plaintiffs must allege malice in their complaint for this claim to withstand this Motion, citing *Sullivan* for this rule of law (Doc. 30, p. 15; Doc. 36, p. 4).  While *Sullivan* requires proof of actual malice to succeed on a defamation claim, the Court finds no requirement that malice be alleged in the Complaint.  *Sullivan*, 376 U.S. at 279-80.  Acknowledging that Plaintiffs do not allege malice in its claim for defamation, the Court, nevertheless, finds factual allegations that support an inference of it.

County Impounding Officer can release the animals to the purchaser of his or her choice; it is at the Officer's discretion.  As such, the Court finds that MCAS had no duty to release any animals to SouthBARK; this means that there was no duty to keep Plaintiff on a list of potential rescuers.

As for the balance of the claim, SouthBARK claims negligence for public comments made against it.  As noted herein, SouthBARK is a public figure for defamation purposes for the issues raised herein and, as such, Plaintiff must demonstrate actual malice to successfully prove its claim. Though Plaintiff did not specifically allege actual malice in its State claim of defamation (count thirteen), the Court did not recommend that it be dismissed, finding that the things said about SouthBARK could be understood as defamatory and to have been made with actual malice.  The Court finds this claim for negligence falls short of what must be proven and is duplicative as well.  Therefore, it is recommended that Defendants' Motion to Dismiss (Doc. 30) be granted as to Plaintiff's claim for negligence (count fourteen).

In the Motion to Dismiss, Defendants also argue that "[c]ounts One, Two, and Ten are due to be dismissed on their face, as those counts fail to assert a recognizable cause of action and put forth nothing more than labels and legal conclusions in the area of First Amendment law and the County's

immunity defense" (Doc. 30, p. 7).  Then, without so much as a

discussion of any of these claims, Defendants, in their

conclusion, "respectfully request[] an Order dismissing counts

One, Two, and Ten on the basis that those 'counts' assert

nothing more than mere labels and legal conclusion[s]" (Doc. 30,

p. 20).  Defendants provide no arguments in their reply brief

either (*see* Doc. 36).

    The Court is not inclined to make Defendants' arguments for

them.  While the assertion may be correct that these claims

amount to nothing more than "labels and legal conclusions," the

Court, without some guidance on the part of the Defendants, is

not going to expend the time to investigate it.  It is

recommended that Defendants' Motion to Dismiss (Doc. 28) as to

counts one, two, and ten be denied.

    In summary, it is recommended that Defendants' Motion to

Dismiss (Doc. 30) be granted as to the following:  Plaintiff

Dusty Feller's asserted claim of standing; count six (§ 1983

defamation); count seven (§ 1983 defamation); and count fourteen

(negligence).  It is further recommended that Defendants' Motion

to Dismiss (Doc. 30) be denied as to the following:  count one

(municipal liability under 42 U.S.C. § 1983); count two (free

speech); count ten (free speech provision of State

constitution); and count thirteen (State common law defamation).

Accordingly, it is recommended that Plaintiff Dusty Feller be

dismissed as a party to this action and that counts six, seven, and fourteen be dismissed as they fail to state a claim upon which this Court can grant relief.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(B); S.D. ALA. L.R.72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this 11th day of September, 2013.


s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE